UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rodney Waldoch,

        Plaintiff,

v.                                         Civil No. 12-1646 (JNE/JSM)
                                           ORDER

Medtronic, Inc.,

        Defendant.

        Plaintiff Rodney Waldoch ("Waldoch") brought this action under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1466 (2006), against Defendant

Medtronic, Inc. ("Medtronic"), his former employer, seeking recovery of Long Term Disability

("LTD") benefits under an employee benefit plan.  Now before the Court are the parties' Cross-

Motions for Summary Judgment.

## I.       BACKGROUND[1]

### A.  The Disability Plan

        Waldoch began working for Medtronic as a Senior Buyer/Planner on January 15, 2001.

He was terminated for performance reasons on November 24, 2008.  During Waldoch's

employment, Medtronic maintained a Long-Term Disability Plan ("Plan").  The Plan is self-

funded, and Medtronic serves as the Plan Administrator.  Hartford was the appointed Claims

Administrator under the Plan.[2]  The Plan provides:

---

[1]      The facts described below are those contained in the administrative record.  References to
the administrative record are cited as "AR [page number]."

[2]      The Plan identifies Integrated Disability Resources (IDR) as the claims administrator, but
it is undisputed that at some point Hartford assumed this role.  *See* Compl. ¶¶ 4, 9, 39 (stating
that Hartford was the third-party administrator under the Plan).

Long Term Disability is designed to provide benefits for qualifying disabilities lasting longer than 26 weeks . . . .

Benefits may not begin until:

- You have been Totally Disabled for 26 weeks in a rolling 12-month period, and

- You have provided documentation satisfactory to Medtronic or its delegated claim administrator proving that you are Totally Disabled.

The Plan defines "Total Disability" and "Totally Disabled" as follows:

During the 26-week elimination period and during the first year that you are receiving Long Term Disability Benefits, you are considered to be Totally Disabled if you are under the care of a Physician and prevented from performing each of the essential functions of your regular occupation because of an illness or accidental injury and you are not working at all. The one year period begins on the first day as of which you have been approved to receive Long Term Disability Benefits.

To be considered Totally Disabled after this period of time, the illness or accidental injury must prevent you from working at *any* occupation for which you are, or could reasonably become, qualified by education, training or experience, and you are not working at all.

To file a claim for LTD benefits, the employee must submit an application to the Claims Administrator. The Plan provides that the Claims Administrator must be able to obtain records and other information from physicians, health care professionals, and vocational experts who have treated, diagnosed, or evaluated the employee. If necessary, the "Claims Administrator may secure independent medical or other advice and require such other evidence as it deems necessary to decide your claim." Within a reasonable time, the Claims Administrator will then "render a decision," and provide written notice of an adverse benefit determination. If the claim is denied, the employee "may appeal the decision to the Claims Administrator," who "will review and consider all written comments and other information [the employee] submit[s]" with the appeal. The Claims Administrator must review and decide the appeal within a reasonable time.

2

The Plan also provides that as part of the application process, the employee "must provide medical evidence, satisfactory to Medtronic or its delegated claims administrator, of your Total Disability."  The employee must provide "proof of your claim," which "consists of the application for Long Term Disability Benefits and such additional medical, vocational and financial information satisfactory to Medtronic and necessary in Medtronic's judgment to verify that you are Totally Disabled."  The Plan further provides that "[t]he Plan Administrator has complete and total discretionary authority to interpret and administer the Plan."  Additionally,

> The Senior Vice President of Human Resources, Vice President of Compensation and Benefits or Director of US Benefits, have the authority and responsibility to interpret the Plan, make rules, determine eligibility for benefits, determine coverage and benefit amounts, and resolve all claims and disputes regarding the Plan.  The decisions of the Senior Vice President of Human Resources, Vice President of Compensation and Benefits or Director of US Benefits are final and binding on all persons.  The Senior Vice President of Human Resources, Vice President of Compensation and Benefits or Director of US Benefits may further delegate any and all authority under the Plan as they deem appropriate.

## B.  Waldoch's Medical History[3]

Waldoch was diagnosed with Type I Diabetes Mellitus in 1969 at the age of ten.  In his late teens, he was diagnosed with diabetes-related retinopathy and peripheral neuropathy.  Waldoch was treated by an internal medicine physician as well as an endocrinologist, and in 2000 he began using an insulin pump to help control his blood sugars.  Medical records from 1999 and 2000 note that Waldoch maintained good control of his diabetes.

In March 2003, Waldoch saw his primary care physician, Dr. Anita Buckler, to whom he reported that he felt fatigued after a day of work, and that "his stress level has affected his blood

---

[3]     Waldoch's medical conditions include physical problems such as carpal tunnel syndrome and peripheral neuropathy.  In this litigation, he asserts that he is disabled by the cognitive effects of his diabetes and poor blood sugar control (and that Medtronic inappropriately focused on his physical conditions in its review of his LTD claim).  The Court will therefore only recite the medical history pertinent to the condition that Waldoch alleges renders him disabled.

sugar level." AR 2856-57.  In July 2004, Waldoch's endocrinologist, Dr. John Bantle, wrote a

letter to Medtronic advising that Waldoch's "diabetes control has recently been aggravated by

the substantial stress he is under at work" and recommended that Waldoch's work schedule be

reduced to thirty-two hours a week if possible.  *Id.* at 2494.  In December 2004, Dr. Buckler also

advised Medtronic that "due to medical conditions," Waldoch should not work over thirty-two

hours a week.  *Id.* at 2495.

In April 2005, Dr. Bantle noted that Waldoch "continued to struggle with controlling his

diabetes in the face of what he thought was a large amount of stress and pressure in his work

place."  *Id.* at 3026.  Waldoch reported symptomatic hypoglycemia that occurred once or twice

per week, and "[a]ll episodes had been easily recognized and treated."  *Id.*  Dr. Bantle described

Waldoch's diabetes as "well controlled."  *Id.*  On May 9, 2005, Dr. Buckler wrote a letter

describing Waldoch's diabetes-related problems, such as retinopathy, neuropathy, and calf-

tightening, as well his hypertension, hyperlipidemia, and carpal tunnel syndrome.  She explained

that because of these difficulties, Waldoch suffered from fatigue and anxiety.  *Id.* at 2509.  She

stated that Waldoch needed to closely monitor and control his blood glucose and regulate his diet

and activity levels closely.  *Id.*  According to Dr. Buckler, such monitoring "can interfere with

job requirements, at times, if there is a timing issue on the tasks."  *Id.*  Waldoch also obtained a

letter from Ann Macheledt, a Program Manager for the State of Minnesota's Staying on the Job

Program.  Ms. Macheledt wrote that Waldoch suffered from fatigue, "[d]ifficulty with

concentration and focus, that is more prevalent when he is fatigued," and "[d]ifficulty with stress

and the affects [sic] that stress has on his diabetes."  *Id.* at 2507.  According to Ms. Macheledt,

Waldoch "described stress at work as resulting from the unpredictability or uncertainty of his

daily job activities, in a work environment that is primarily tactical and reactive in nature."  *Id.*

She also stated in her letter that Waldoch had "[d]ifficulty with fluctuating blood sugars (highs and lows), which are influenced by stress." *Id.*

On October 4, 2005, Waldoch saw endocrinologist Dr. William L. Isley, who noted that Waldoch had not had "a severe hypoglycemic spell in the last year," but that he had lost certain symptoms as a warning for hypoglycemia. *Id.* at 265. Dr. Isley also stated that Waldoch "has had fatigue for about four years and has gotten progressively worse." *Id.* Dr. Isley diagnosed Waldoch as having "hypoglycemia unawareness." *Id.* at 267. In January 2006, Dr. Isley wrote a letter to Ann Macheledt, again stating that Waldoch suffered from "hypoglycemia unawareness," along with other diabetes-related conditions. *Id.* at 2528. Dr. Isley stated that he would "support a four-day work week to help Mr. Waldoch more effectively manage his diabetes," and that it would be helpful if Waldoch "did not work extra hours during his regular work days to try to help improve management of his diabetes." *Id.*

Waldoch saw endocrinologist Dr. Victor M. Montori on October 31, 2007. Dr. Montori noted that Waldoch's diabetes was "well-controlled," but that "examination of his self monitored glucose reveals quite a bit of glucose variability." *Id.* at 4379-80. Dr. Montori suggested adjusting Waldoch's insulin and improving his carbohydrate counting skills. On April 8, 2008, Kathleen J. Wangen, a nurse in the Mayo Clinic's endocrinology department, entered a note stating that Waldoch "describes some days at work as being very stressful and his insulin needs are greater on those days." *Id.* at 4365. On May 27, 2008, Dr. Montori noted that Waldoch had "less glucose variability" and had been achieving "good results." *Id.* at 4363-64. Dr. Montori also stated that Waldoch "clearly is stressed about work (Medtronic has announced a layoff in his area) and this also has chronically affect [sic] his ability to cope with his disease." *Id.* "Nonetheless, he is improving and he knows this." *Id.* On July 30, 2008, Dr. Montori received

an email from Waldoch indicating that Waldoch had very elevated blood sugars.  Dr. Montori

noted that "[t]his appears to be related to stress related to his job," and recommended that

Waldoch "engage in physical activity to manage both problems." *Id.* at 4360.

On September 8, 2008, Dr. Montori noted that Waldoch's "blood sugar control on

average is better than before and he does not have the extreme low blood sugars that he had

when we first met," but that he continued to have wide blood sugar ranges.  *Id.* at 4358.  Dr.

Montori stated that "[u]nfortunately, job difficulties have continued and contribute to

[Waldoch's] overall stress," in turn leading to more variability in Waldoch's blood sugars.  *Id.*

"Confounding this is the presence of binding insulin antibodies."  *Id.*  According to Dr.

Montori's note, Waldoch was "exploring the impact that his work and stress is causing on his

diabetes control and is considering looking for an alternative job accommodations."  *Id.*

Waldoch had noted that "every time he is off work or in a better work environment, his blood

sugars improve." *Id.*  Dr. Montori encouraged Waldoch "to look for alternative jobs that would

provide him with an environment that would be conducive to better self management." *Id.*

On January 21, 2009, after his termination from Medtronic, Waldoch saw endocrinologist

Dr. Sumit Bhagra.  Dr. Bhagra noted that Waldoch "report[ed] that his job schedule was

stressful, and there were constant deadlines which prevented him from paying the required

amount of attention to diabetes management."  *Id.* at 4352-54.  Dr. Bhagra also commented on

Waldoch's elevated insulin antibodies, stating that "these might contribute to unpredictable

insulin delivery." *Id.*  That same day, Dr. Yogish C. Kudva, another endocrinologist, reported

that Waldoch's hypoglycemia was "[m]ild; one to three times in the last 30 days," and that

Waldoch did have hypoglycemic awareness.  *Id.* at 4348.  On February 4, 2009, Dr. Kudva saw

Waldoch for a follow-up of his "significant glucose variation."  *Id.* at 4349.  Dr. Kudva noted

that Waldoch's "significant titer of insulin antibodies . . . might correlate with increased glucose variation but scientifically we do not have the best proof for this." *Id.* Dr. Kudva stated that it was very "challenging" for Waldoch to manage his diabetes and perform well at work, although Waldoch had "done this very well for 40 years." *Id.* After another visit on April 2, 2009, Dr. Kudva noted that Waldoch "has had no hypoglycemic episode entered into the pump" and that Waldoch did have some warning regarding hypoglycemia. *Id.* at 4338-39. He "congratulated [Waldoch] on his self care" and described Waldoch's diabetes as under "reasonable control." *Id.*

On May 12, 2009, Waldoch saw primary care physician Dr. Robert B. Howe, who noted that Waldoch "lost his job for under performance but cannot relate that directly to his blood sugar levels." But Waldoch's blood sugar levels "have not been checked in a manner to determine that." *Id.* at 4246. Waldoch saw Dr. Montori on July 6, 2009 to discuss applying for long-term disability. Dr. Montori stated that "[i]t is clear that Mr. Waldoch has a difficulty associated with type I diabetes and that this difficulty involves mostly the unpredictability of his blood sugars." *Id.* at 4345. Dr. Montori noted that having a continuous glucose monitor may help Waldoch "achieve better diabetes control and prevent hypoglycemia." *Id.* Dr. Montori explained the need to deal with the "behavioral aspects of [Waldoch's] condition," stating that Waldoch's treatment should include "behavioral psychological support" to deal with Waldoch's "anxiety associated with high blood sugars." *Id.* Dr. Montori noted the existence of insulin antibodies, to which Waldoch had "attributed . . . the variability in his blood sugars." *Id.* Dr. Montori believed that "a big part of the work in the future for Mr. Waldoch will be to deal with this and to refocus energies on the behavioral aspects that could help cope and overcome with the difficulties that his biology may pose to him." *Id.* "Thus, I expect Mr. Waldoch eventually to return to local employment if he is able to manage a more predictable glucose regimen, which

again I hope we can achieve with this three-prong approach." *Id.*  With respect to Waldoch's

LTD application, Dr. Montori stated that "we have gone ahead and filled the paperwork for his

long-term disability to provide him potentially with financial support that will, in addition to the

technical and behavioral support, regain his health and hopefully return to work and become,

once again, a productive member of society." *Id.*

Waldoch saw endocrinologist Dr. Bantle on July 16, 2009, who described Waldoch's

diabetes as "well controlled." *Id.* at 4244-45.  He noted that although Waldoch "described

symptomatic hypoglycemia that occurred on most days," the hypoglycemia "was always easily

recognized that treated" and that there "was no history of serious hypoglycemia." *Id.*  On July

30, 2009, Dr. Kudva noted that Waldoch's hypoglycemia awareness was "quite good," but that

he had a "variable glucose threshold for recognition" and that "his adrenergic symptoms are not

as pronounced." *Id.* at 4312.  Waldoch "still has hypoglycemia about four to five times/week

with symptoms and twice a week or so without symptoms." *Id.*  Dr. Kudva described Waldoch

has having "significant glucose variability." *Id.*  On September 1, 2009, Dr. Kudva stated that

Waldoch's "adrenergic symptoms with hypoglycemia are less," and that Waldoch "more often

than not . . . has hypoglycemia with less symptoms now," occurring four to five times per week.

*Id.* at 4327.  Waldoch also continued to experience fatigue.  Dr. Kudva remarked that Waldoch's

"overriding of the bolus [of insulin] does result in some hypoglycemia for him," and Dr. Kudva

"[e]ncouraged him to decrease overriding and to work at adjusting his bolus setting."  *Id.*

On September 4, 2009, Waldoch saw another endocrinologist, Dr. Mark Stesin.  Dr.

Stesin noted that Waldoch had hypoglycemia "at least 50% of days, almost always afternoon

[and] evening" and that Waldoch had "[s]ome hypoglycemic unawareness, esp[ecially] if active

at time of low sugar."  *Id.* at 4414.  He also stated that Waldoch had "good awareness/able to self

treat." *Id.* at 4419.  On October 26, 2009, Dr. Stesin reported that Waldoch had "improving

control" over his blood sugars, with values mostly between 90-150.  *Id.* at 4420.  On January 26,

2010, Dr. Stesin noted that Waldoch's diabetes was "stable overall."  *Id.* at 4421.  In other office

notes, Dr. Stesin remarked that Waldoch's diabetes was "stable," *id.* at 4409, and that his control

was "improving," *id.* at 4412.

On December 1, 2010, Waldoch saw endocrinologists Dr. Kalpana Muthusamy and Dr.

Kudva.  Dr. Muthusamy remarked that Waldoch had "significant glycemic variability and

difficult-to-control diabetes over several years in the setting of positive insulin antibodies."  *Id.* at

3455.  Waldoch was experiencing "hypoglycemic episodes almost on a daily basis," with

"reduced glycemic awareness."  *Id.*  Dr. Muthusamy also noted that "[t]here is equal distribution

of episodes which are symptomatic versus asymptomatic."  *Id.*  According to the medical note,

Waldoch had required assistance one to three times in the prior six months for hypoglycemia.

Dr. Muthusamy diagnosed Waldoch with "hypoglycemic unawareness and frequent

hypoglycemia and fear of hypoglycemia."  *Id.* at 3457.  With respect to the mechanism of

glycemic variability, Dr. Muthusamy stated that "it is unclear whether the insulin antibodies have

a significant role in this individual patent."  *Id.*  She counseled Waldoch on the appropriate use

of insulin and calorie intake.  *Id.*  Dr. Kudva discussed Waldoch's health and treatment with Dr.

Muthusamy, and described Waldoch as having "limited hypoglycemic awareness."  *Id.* at 3454.

**C.  Waldoch's LTD Benefits Claim History**

The eligibility determination for long-term disability under Medtronic's Plan involves

two steps.  First the employee must show that he is unable to perform his own occupation

because of his condition ("own occupation" LTD benefits).  After one year of receiving "own

occupation" LTD benefits, the employee can only continue to receive benefits if he shows that he

cannot work in any occupation ("any occupation" LTD benefits).  Waldoch filed his claim for

LTD benefits with Medtronic on July 27, 2009, asserting disability beginning November 24,

2008.  Waldoch included with his application an Attending Physician Statement ("APS") dated

July 6, 2009, completed by Dr. Montori.  Dr.  Montori identified Type I diabetes as the

"[d]iagnosis impacting function," and stated that Waldoch had been diagnosed as having insulin

antibodies.  *Id.* at 1119.  The APS indicated that Waldoch was receiving "intensive insulin

therapy with insulin pump," and that when he becomes hypoglycemic, Waldoch reported

subjective symptoms of irritability, anxiety, and inability to focus.  *Id.*  Under "objective

findings," Dr. Montori stated that "glucometer data reveals frequent numbers out of range."  *Id.*

Dr. Montori indicated that Waldoch had no activity restrictions, but that he "cannot engage in

predictable ongoing activity, be it physical or mental, without disruption by variations in his

blood sugar."  *Id.* at 1120.  "These variations are both unpredictable and symptomatic," Dr.

Montori stated, and that "[w]hile able, the unpredictability prevents [Waldoch] from focusing

and executing work."  *Id.*

Dr. Montori provided an additional APS and letter dated August 4, 2009.  In the letter,

Dr. Montori explained that Waldoch "needs to self-monitor frequently and be vigilant with his

sugar levels." *Id.* at 3391.  The letter described Waldoch's "unpredictable variations in blood

sugars," noting while the cause of the variations was "somewhat unclear," the presence of insulin

antibodies may play a role.  *Id.*  Dr. Montori stated that the "[v]ariability in blood sugars and

unpredictable swings can lead to unexpected hypoglycemia," which can affect patients'

"concentration, attention, mood, cognition, and judgment."  *Id.*  He explained that hypoglycemia

can cause difficulty with completing "cognitive tasks that require focused effort" and can cause

10

"difficulties with interpersonal communication" and "poor cognitive performance."[4]  *Id.*  Dr. Montori noted Waldoch's limited success in regulating his glucose levels, and stated that "[a]s a result adaptations at work such as flexibility of scheduling including adaptations to address unexpected glucose variations and need for attention to diabetes care, limited cognitive and interpersonal tasks and carefully titrated opportunities to operate delicate or heavy machinery, or make important decisions may facilitate his work performance."  *Id.* at 3391-92.

On August 10, 2009, Hartford's Ability Analyst, Holly Koberstein, interviewed Waldoch and then obtained and reviewed Waldoch's files from his treating physicians.  On August 12, 2009, Hartford sent a letter to Dr. Montori, asking Dr. Montori to "indicate the frequency that you [sic] patient experiences episodes of low blood sugar, and please comment on the severity of the impact to your patients neurological processes."  *Id.* at 3387.  Dr. Montori responded that Waldoch "experiences low blood sugars 4 to 5 times per week with symptoms that interfere with daily life; he gets 1-2 episodes per week with no symptoms.  Each episode can disrupt and interrupt activity for 15-30 minutes and neurologically impair the patient over time."  *Id.* at 3386.

Based on the material Hartford received, Hartford concluded that the medical record did not indicate that Waldoch was disabled prior to his termination date.  *Id.* at 7.  According to Hartford, Waldoch had noted that because of his "high demanding job," he "would sometimes forget to monitor his glucose."  *Id.*  But "forgetting to take and/or monitor meds would not establish [disability]."  *Id.*  Hartford therefore recommended denial of Waldoch's LTD claim, and on August 25, 2009, sent Waldoch a notice of the decision, providing the basis for its denial.  *Id.* at 405-08.  Waldoch appealed the denial on February 22, 2010 and provided additional information and records for Hartford's review, including the clinical notes from his visits with

---

[4]        The letter, however, did not specifically attribute these symptoms to Waldoch.

Dr. Howe and Dr. Stesin.  Dr. Stesin submitted a statement dated May 3, 2010, stating that

Waldoch "has had frequent episodes of hypoglycemic unawareness" which "can be very

problematic for him and cause fluctuations in mood, demeanor and productivity." *Id.* at 1467-68.

"Because he is not aware when these events happen, he cannot control or avoid them.  This

certainly would significantly contribute to poor work performance and impairment of the ability

to perform sustained ad [sic] reliable work effort." *Id.*

Hartford retained two physicians to review Waldoch's file—Dr. Marcus Goldman, Board

Certified in Psychology and Neurology/Psychiatry, and Dr. Steve Fordan, Board Certified in

Internal Medicine/ Endocrinology, Diabetes and Metabolism.  After reviewing Waldoch's file,

Dr. Goldman concluded that "[t]here are no psychological conditions supported by the clinical

evidence that are functionally impairing . . . for the period of 11/2008 through the present" and

that the "data are poorly compelling and do not sufficiently, objectively, or in any compelling

fashion, support functional incapacity as a result of a major mental condition." *Id.* at 215.

Dr. Fordan reviewed Waldoch's file, including the notes and letters by Drs. Montori,

Kudva and Stesin. *Id.* at 217-25.  Dr. Fordan noted that although Waldoch claimed that his

unsatisfactory work performance was due to his diabetes and unstable blood sugars, "[t]he only

evidence the claimant gives is self-reported, which in turn is re-reported by his treating

physicians," and that "[t]here is no objective evidence of impairment." *Id.* at 217.  He further

stated that although Waldoch "attributes changes in his personality to his fluctuating blood

sugars[,] [t]here is no evidence to contradict the converse—that his blood sugars fluctuate due to

his behavior." *Id.*  Dr. Fordan commented that it was not until July 16, 2009 that Waldoch

reported symptomatic hypoglycemia "on most days," and that Waldoch's complaints of work-

related stress predated his complaints of hypoglycemic episodes.  Although progress notes

described "symptomatic hypoglycemia," Dr. Fordan found "no specific episodes or objective

evidence of such hypoglycemia within the provided records." *Id.* at 222. In Dr. Fordan's

opinion, the medical records suggested that work stressors were affecting Waldoch's diabetes

control, "not the other way around." *Id.* at 220. Dr. Fordan opined that even Dr. Kudva,

Waldoch's treating physician, expected Waldoch's health to improve and for Waldoch to return

to work. Further, Dr. Stesin repeatedly remarked that Waldoch's diabetes was controlled and

"stable," and Dr. Kudva had noted in August 2009 that Waldoch's hypoglycemia awareness was

"quite good." Dr. Fordan did find support for some functional limitations, such as ensuring that

Waldoch have time to check his blood sugars as needed and that Waldoch should avoid certain

activities without first checking his blood sugar. Overall, Dr. Fordan concluded that there was

"no objective evidence of impairment or an inability to work due to hypoglycemia." *Id.* at 223.

After Hartford completed its review of Waldoch's appeal, Hartford concluded that

Waldoch was entitled to LTD benefits based on disability from his own occupation, entitling him

to benefits through May 26, 2010.[5] In a letter dated June 21, 2010, Hartford notified Waldoch of

its decision regarding the grant of "own occupation" LTD benefits, but explained that further

investigation was necessary to determine if Waldoch was also entitled to "any occupation" LTD

benefits beyond May 26, 2010. *Id.* at 392. In Hartford's Summary Detail Report, Hartford

indicated that the additional investigation was necessary in part because there had been

documentation that Waldoch was seeking other employment and had also applied for and

received unemployment benefits, which Hartford felt "would indicate the claimant, himself, feels

---

[5]     After some confusion on the part of Hartford, Hartford explained in its Summary Detail
Report that "the decision to reverse the initial denial of Mr. Waldoch's claim regarding Total
Disability from his own/regular occupation was ultimately made by the Employer (MDT)
following a conference call with the ER wherein HL recommended upholding the initial decision
based on the weight of the evidence." AR 47. It was later confirmed on July 27, 2011, that
Waldoch's claim was under an "ASO," or administrative services only, plan. *Id.* at 54-55.

he is capable of working in some capacity." *Id.* at 26.  Hartford also noted that Waldoch's use of

a continuous glucose monitor may reduce his need for "self checking and/or insulin injections,"

and that Dr. Stesin's recent office visit note dated April 16, 2010, suggested that Waldoch's

diabetes was stable.  *Id.*

　　　As part of its review, Hartford requested an employability analysis report ("EAR"),

which was completed on July 26, 2010.  *Id.* at 302-22.  The EAR identified five occupations

within the "closest" level, 38 occupations within the "good" level, 107 occupations within the

"fair" level, and 95 occupations within the "potential" level.  These occupations met the median

monthly wage requirements and were found to exist in reasonable numbers in the national

economy.

　　　On September 8, 2010, Waldoch informed Hartford that his Social Security

Administration ("SSA") disability claim had been approved.  *Id.* at 34, 183-87, 3328-36.  The

Administrative Law Judge ("ALJ") found that Dr. Montori and Dr. Stesin's statements regarding

Waldoch's diabetes and cognitive limitations were "supported by the medical record," and gave

their statements "controlling weight."  *Id.* at 3335.  "Based upon their statements, the

undersigned finds that the claimant does not have the ability to sustain work activity eight hours

a day, five days a week."  *Id.*

　　　Hartford also retained Dr. A. Wayne Meikle, Board Certified in Endocrinology, Diabetes

and Metabolism, to perform an additional peer review.  *Id.* at 3300-05.  Dr. Meikle reviewed

Waldoch's records from 2004 to 2010, and concluded in a report dated October 7, 2010 that

Waldoch did not have any functional limitations or restrictions.  Dr. Meikle noted the 2004

records, which indicated that Waldoch's diabetes control was "aggravated by stress at work."  *Id.*

at 3300.  He noted the presence of "immune diabetes," but also commented on the repeated

statements by Waldoch's treating physicians in 2009 that Waldoch was "minimal risk for hypoglycemia," that Waldoch "could detect hypoglycemia and treat[] it appropriately," and that Waldoch's "hypoglycemia awareness was good." *Id.* at 3301-02. According to Dr. Meikle, Waldoch's only restriction was the requirement for flexibility to test his blood glucose and adjust his insulin therapy and dietary intake as needed, "based on his glucose readings for 10 minutes every 4 hours." *Id.* at 3303. Dr. Meikle found no evidence to support the need for a reduced 32-hour work week, and overall found that Waldoch did "not have any significant impairment of mental function." *Id.* at 3303-04. Upon receipt of Dr. Meikle's report, Hartford requested another EAR to ensure that prior identified jobs were still prevalent within the national economy. An addendum to the EAR, dated October 18, 2010, indicated that Dr. Meikle's review did not change the results. *Id.* at 3310.

Based on its review, Hartford concluded that Waldoch was able to perform any occupation and that the information contained in his file would not support Total Disability as of May 26, 2010. *Id.* at 39-40. On October 22, 2010, Hartford sent Waldoch a letter, notifying him of the denial of his claim for "any occupation" LTD benefits. *Id.* at 97-101. The letter indicated that Hartford's decision was based on the Plan language and all the documents in Waldoch's claim file, including, but not limited to, Waldoch's application for LTD benefits, the information submitted and generated as part of Waldoch's appeal, the independent medical reviews conducted by Dr. Fordan, Dr. Goldman, and Dr. Meikle, a review of the claim file by Hartford's Medical Case Manager, and the employability analysis conducted by Hartford's Vocational Rehabilitation Case Manager. *Id.* The letter explained that Waldoch had diabetes, and "that due to work stressors, Mr. Waldoch was unable to monitor and control his blood sugars." *Id.* According to Hartford, this resulted in unpredictable episodes of hypoglycemia, which Waldoch

"contended caused his poor work performance and inability to work in his own occupation." *Id.*

The letter summarized Dr. Fordan, Dr. Goldman and Dr. Meikle's reviews, and also described

Dr. Montori's statements regarding Waldoch's diabetes, glucose awareness, and severity of

hyper- and hypoglycemic episodes. The letter concluded by informing Waldoch of his right to

appeal the denial, and stated that once Hartford received Waldoch's appeal, the "Plan Sponsor

will consider your appeal and make the final decision." On May 25, 2011, Waldoch appealed

the denial of his claim for "any occupation" LTD benefits. Along with his appeal he submitted

additional medical records and correspondence, including letters from Dr. Montori, Dr. Kudva

and Dr. Elizabeth Seaquist, the favorable SSA decision, and Waldoch's blood glucose data.[6]

In Dr. Kudva's May 11, 2011 letter, he stated that Waldoch "faces significant variation in

his glucose," related to many factors including his "high titer of antibodies to insulin." *Id.* at

3449-50. Dr. Kudva noted recent episodes of hypoglycemia, one of which required the use of IV

glucose to help improve Waldoch's glucose status. He commented that Waldoch encounters

"significantly high and low blood sugars several times daily," and that these variations are "most

of the time impossible to predict." *Id.* Dr. Kudva also noted that Waldoch was sometimes

unable to recognize his hypoglycemia. With regard to Waldoch's claim for disability, Dr. Kudva

noted, "I believe that Mr. Waldoch is an appropriate candidate for long term disability. Since he

has to confront low and high blood glucose several times daily and responding to this involves

extensive amounts of time daily, I do not believe that he can work." *Id.* Dr. Kudva stated that

although Waldoch used a continuous glucose sensor, "attending to its warnings . . . involves a

fair amount of time daily which would clearly interfere with his ability to work." *Id.*

---

[6]     The blood glucose data revealed that Waldoch had twenty-two hypoglycemic episodes
over an eleven-day period, but the data did not indicate which, if any, of the episodes were
symptomatic.

Dr. Montori wrote a letter dated April 12, 2011, expressing his agreement with Dr. Kudva's assessment of Waldoch's functional capacity.  *Id.* at 3451.  Dr. Montori stated that Waldoch experienced "disabling hypoglycemia," and opined that Waldoch's condition "is unlikely to improve in the short term, thus rendering his disability long term."  *Id.*  Further, Dr. Montori believed that Waldoch's "disability stems from hypoglycemia which is unpredictable, of severe intensity on occasions, and recalcitrant to multiple therapeutic modalities."  *Id.*

According to Dr. Seaquist's March 30, 2011 letter, Dr. Seaquist first met Waldoch on the day she wrote the letter.  The letter discussed generally the effects that high levels of anti-insulin antibodies can have on patients with diabetes—namely, that the antibodies "have been seen in patients with diabetes who have great difficulty controlling their blood sugar," and "can cause insulin resistance and subsequent hyperglycemia as well as hypoglycemia."  *Id.* at 3452. According to Dr. Seaquist, both hyper- and hypoglycemia "can produce symptoms of fatigue and make it difficult for someone to concentrate."  *Id.*  Further, "[t]hese symptoms can have a profound effect on the ability to work and do the usual activities of normal living," and "the stress associated with unpredictable blood sugars and the requirement for more intense monitoring of blood sugars can prevent a person from focusing on their job."  *Id.*

Hartford retained Dr. Robert J. Cooper, Board Certified in Internal Medicine/ Endocrinology, Diabetes and Metabolism to review Waldoch's file.  *Id.* at 449-52.  In his report, Dr. Cooper noted Waldoch's "glycemic variability," presence of insulin autoantibodies, and daily episodes of hypoglycemia with hypoglycemic unawareness.  He reviewed the physicians' letters and then followed up with a phone conversation with Dr. Kudva on July 29, 2011. According to Dr. Cooper, during that conversation Dr. Kudva stated that Waldoch "would be capable of functioning in a sedentary capacity if significant accommodation were made in a

17

'sympathetic workplace.'" *Id.* at 450-51.  Dr. Cooper concluded that the subjective reports were

not consistent with the clinical findings, and that as of May 26, 2010, Waldoch had the ability to

sustain full-time work.   *Id.* at 452.  He also concluded that "[a]ccommodations should be made

for brief breaks (up to ten minutes) every two hours in an eight hour day with access to

carbohydrates for snacking." *Id.*  Hartford subsequently obtained a new EAR to account for Dr.

Cooper's review.  *Id.* at 584-96.  The EAR identified numerous occupations and ultimately

selected four occupations that did not require additional training, existed in reasonable numbers

in the national economy, and met the monthly income requirements.

      Based on its review, Hartford determined that the denial of LTD benefits should be

upheld and entered its recommendation into the Summary Detail Report.  *Id.* at 60-62.  On

August 16, 2011, Renee Ethier, a Hartford Appeal Specialist, informed Laura Erchul, the Senior

Benefits Analyst at Medtronic involved in Waldoch's claim, of Hartford's recommendation and

included a four-page summary of Hartford's review of the appeal.  *Id.* at 62, 578-83.  Ethier

noted that Medtronic was to review the appeal recommendation and claim file, make the appeal

decision, and notify her of the decision.  *Id.* at 578.  On August 17, 2011, Hartford sent a copy of

Waldoch's medical records via UPS to Ms. Erchul.[7]  *Id.* at 63.  On August 18, Erchul sent an

email to Ethier, stating, "We agree with the recommendation to uphold the denial." *Id.* at 578.

On August 22, 2011, Ethier informed Hartford's Ability Analyst, Holly Koberstein, that "[t]he

Plan Sponsor advised of their decision regarding Mr. Waldoch's appeal," and that "[t]hey agree

to uphold the termination decision." *Id.* at 577; *see also id.* at 63 (entry in the Summary Detail

---

[7]      Medtronic asserts that this was not the first time it received a copy of Waldoch's medical file.  Without additional guidance, however, the Court cannot locate within the 4500-page administrative record a specific reference to Medtronic having previously received Waldoch's medical records—although the Court has found references to Medtronic having received various documents within the file such as the SSA determination and the EAR, as well has having been copied on various communications to Waldoch.  *See, e.g.*, *id.* at 26, 34, 40.

Report stating that Hartford "[r]eceived response from Plan Sponsor" and that "[t]he Plan Sponsor agrees with the appeal recommendation to uphold the termination decision").

On August 22, 2011, Hartford sent Waldoch a letter, informing him that after Hartford and Medtronic's review of the appeal, "[t]he Plan Sponsor . . . determined the decision to terminate Mr. Waldoch's claim for LTD benefits beyond May 25, 2010 was appropriate and therefore, that decision will stand." *Id.* at 138-42.  The letter referred to the October 22, 2010 denial letter as providing the rationale for denying the claim, and described Dr. Cooper's peer review of Waldoch's medical file.  The letter also stated that although Waldoch had been approved for Social Security Disability Income, Hartford considered the SSA's disability determination "as one piece of relevant evidence," but the SSA's "determination is not conclusive." *Id.*  Hartford then provided some reasons as to why it might have arrived at a different conclusion than the SSA.

Waldoch sent Hartford a letter on August 25, 2011, correctly asserting that Dr. Cooper had not considered a second letter by Dr. Seaquist, dated July 27, 2011.[8] *Id.* at 132-37.  Waldoch also asserted that Hartford failed to consider the glucose data, medical records, and letters that he had submitted.  Hartford confirmed that Dr. Cooper had not received Dr. Seaquist's July 27 letter, but stated that it had, in fact, considered the glucose data, medical records, and other letters that were in the file.  *Id.* at 64.  On September 16, 2011, Hartford emailed Ms. Erchul to inform her of Waldoch's letter, and attached a copy of the letter along with Hartford's review of the information.  *Id.* at 489.  Medtronic advised that the additional information should be reviewed by a peer reviewer and the letter was sent to Dr. Cooper to review.  *Id.*at 65, 350.

---

[8]     Dr. Cooper had apparently not received this letter prior to issuing his report.

Dr. Seaquist's letter indicated that Waldoch's "blood sugars are very difficult to control and without appropriate attention he can lose consciousness from low or high blood sugars." *Id.* at 136-37. She noted that Waldoch "must check his blood sugars many (8+) times a day and have ready access to food and insulin," and that he must be able to "check his sugars immediately upon feeling symptoms of high or low sugar." *Id.* Because "[s]uch an activity interrupts whatever he is doing and makes it difficult to concentrate on the task at hand," Waldoch "has difficulty with many of the activities of living." *Id.* Further, "[h]is hypoglycemia and erratic sugars cause him to be irritable and fatigued." *Id.* Dr. Seaquist remarked that Waldoch did not have any activity limitations, but that he must be able to stop performing any activity "if he feels his blood sugar is too high or low so that he can check his sugar and take appropriate action." *Id.* As a result of Waldoch's fatigue, Dr. Seaquist noted that at any given time Waldoch may be unable to perform various activities.

Dr. Cooper issued an addendum to his report on September 30, 2011, based on his review of Dr. Seaquist's letter, in which he stated that his "[r]eview of the new information does not change my previous opinion." *Id.* at 456-58. He did not believe there was any evidence that the frequency of blood sugar monitoring or glucose control was resulting in fatigue or would result in the limitation of activities, and he noted that Dr. Seaquist did not identify any specific restrictions or limitations. He stated that although Waldoch has hypoglycemic unawareness with daily episodes of hypoglycemia, none of the episodes were severe enough to result in loss of consciousness or seizure. He therefore concluded that the recommendations in his original report remained appropriate—that because of frequent episodes of hypoglycemia, "accommodations should be made for frequent breaks with access to carbohydrates for snacking and the claimant should be restricted from climbing ladders or working at heights." *Id.*

On October 6, 2011, Hartford sent Medtronic all claim documents since the August 22 decision, including Dr. Cooper's updated report. *Id.* at 67-68. Hartford recommended that Medtronic uphold the denial decision. *Id.* On November 8, 2011, Medtronic requested—and Hartford provided—a copy of the entire claim file. *Id.* at 70-71. On November 28, 2011, Hartford sent a letter to Waldoch informing him that Dr. Seaquist's letter had been reviewed by Dr. Cooper, whose medical opinion remained unchanged. *Id.* at 4496-97. "The Plan Sponsor completed their review and determined the decision to terminate Mr. Waldoch's claim for LTD benefits beyond May 25, 2010 was appropriate and therefore, that decision will stand." *Id.* Waldoch filed this lawsuit on July 6, 2012.

## II.     DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B. Denial of Benefits—Standard of Review**

A participant in an ERISA plan may bring suit "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). Typically, a court reviews de novo a denial of benefits challenged under that section. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id.*

Medtronic asserts that the Court should review Medtronic's decision for an abuse of discretion; Waldoch contends that de novo review is appropriate. The Plan provides that as part of the application process, the employee "must provide medical evidence, *satisfactory to Medtronic or its delegated claims administrator*, of your Total Disability." AR 80 (emphasis added). The employee must provide "proof of your claim," which "consists of . . . information *satisfactory to Medtronic* and necessary in Medtronic's judgment to verify that you are Totally Disabled." *Id.* at 84-85 (emphasis added). This language is generally sufficient to confer discretion such that de novo review of Medtronic's decision is inappropriate. *See Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 839-40 (8th Cir. 2001); *Bounds v. Bell Atl. Enters. Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994) (stating that language such as "all proof must be satisfactory to us" qualifies as "explicit discretion-granting language"). The Plan further provides that "[t]he Plan Administrator has complete and total discretionary authority to interpret and administer the Plan."

Waldoch concedes that the Plan contains explicit discretion-granting language, but contends that this language only confers discretionary authority on three specific individuals at

Medtronic: the Senior Vice President of Human Resources, the Vice President of Compensation and Benefits, and the Director of US Benefits. Waldoch asserts that none of these individuals were involved in the review of Waldoch's claim because the only Medtronic employee involved in the review, as reflected by the administrative record, was Laura Erchul, a Senior Benefits Analyst at Medtronic. In response to this argument, Medtronic submitted Laura Erchul's declaration, in which she explains that she reported directly to Medtronic's Director of US Benefits, Roger Chizek, and that during the course of Waldoch's claim and appeal, she consulted with Mr. Chizek on a regular basis. Erchul Decl. ¶¶ 2, 7, 8 (ECF No. 35). According to Erchul, Mr. Chizek made the final decision to deny Waldoch's "any occupation" LTD claim in August 2011 and November 2011. *Id.* ¶ 9. As Medtronic's point of contact with Hartford, Erchul communicated these decisions to Hartford. *Id.* ¶¶ 7, 9.[9]

Waldoch argues that the Court should strike the declaration and exhibits because they are supplemental evidence that are not part of the administrative record. The Court, however, may nevertheless consider them for the purpose of determining the appropriate standard of review. *See Farley v. Ark. Blue Cross & Blue Shield*, 147 F.3d 774, 777 n.4 (8th Cir. 1998) ("[C]onducting limited discovery for the purpose of determining the appropriate standard of review does not run afoul of the general prohibition on admitting evidence outside the administrative record for the purpose of determining benefits."); *Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583 (8th Cir. 1999) (discussing additional evidence provided that described "who was involved in the review process and the results of the reviewers' decisions" and stating that alleged procedural irregularities regarding the processing of the claim "were subject to

---

[9]    Along with her declaration, Erchul also provided additional exhibits supporting her claim that she consulted with Chizek, including calendar appointments from her Microsoft Outlook calendar and emails between herself, Chizek, and Hartford.

properly conducted discovery").[10]   The Court finds that a person with discretionary authority

under the Plan made the final decision to uphold the denial of Waldoch's LTD claim, and that

decision will be reviewed for an abuse of discretion.[11]

---

[10]      The Court notes that at no point during the administrative proceedings did Waldoch call
into question Erchul's authority or whether or not Medtronic's Director of US Benefits was
involved.  Had he done so, perhaps these additional submissions would have been made part of
the administrative record.  But absent such an assertion, there is no reason that Erchul's
declaration or exhibits such as Microsoft Outlook calendar appointments would have been part
of the record.

[11]      Waldoch also argued that the additional information should have been produced during
discovery.  During the administrative process, Waldoch requested the identities of the Medtronic
personnel involved in the review of his claim.  But he was not entitled to such information under
29 C.F.R. § 2560-503-1(h)(3)(iv), the only ERISA regulation he cited in his requests.  In
Medtronic's initial disclosures, Medtronic identified as individuals likely to have discoverable
information those individuals "contained in the administrative record of Plaintiffs' long-term
disability claim."  Parritz Decl. Ex. A, at 1 (ECF No. 44-1).  The administrative record included
a copy of Medtronic's LTD Plan, which explicitly identified the Director of US Benefits as one
of the people authorized to administer and interpret the Plan.  The administrative record also
identified Erchul as the Medtronic employee involved in reviewing Waldoch's claims.  Waldoch
was well aware of Erchul's use of the word "we," in her email to Hartford that stated, "We agree
with the recommendation to uphold the denial [of benefits]," and even noted this reference to
"we" in one of his communications to Hartford.  AR 122, 578.  Waldoch conceded at oral
argument that despite having the opportunity for discovery in this case, he chose not to conduct
any, as he did not believe it was his burden to do so.
         Waldoch has also demonstrated no prejudice resulting from the consideration of this
evidence for the limited purpose of determining the appropriate standard of review.  His only
argument is that he was limited to the remaining number of words in his reply brief permitted by
the Local Rules.  Waldoch never requested an extension of the word count limitations, nor did he
explain what he would have argued had he had more words to work with.  Further, Waldoch's
reliance on *Hartford's* belief that Erchul was the only Medtronic individual involved in
reviewing Waldoch's claim was not reasonable—there is no reason why Hartford would know of
the involvement of any Medtronic individual other than the person who served as its point-of-
contact.  Moreover, Mr. Chisek's involvement in Medtronic's review should have come as no
surprise—his position as Director of US Benefits is identified as one with discretionary authority
under the Plan, and Erchul worked directly under him within his department.
         For all those reasons, and as stated on the record, Waldoch's motion to strike is denied.
Contrary to Waldoch's assertions, the additional evidence does not change or contradict any
information contained in the administrative record, nor does it purport to provide additional
explanations for Medtronic's decision.  Rather, it was submitted—and will be considered—only
for the limited purpose of determining the proper standard of review.

Finally, although Waldoch concedes that Medtronic was the final decision-maker with respect to his appeal, he asserts that the decision should nevertheless be reviewed de novo because the administrative record contains "no notes, reports or documentation providing any analysis" of Medtronic's review process.  He points to Hartford's extensive involvement in the processing and review of his claim and appeal, and contends that Hartford in fact made the decision—which Medtronic only rubber-stamped at the end of the process—and *Hartford's* decision is not entitled to deferential review.  In support of his argument, Waldoch relies heavily on *McKeehan v. Cigna Life Insurance Co.*, 344 F.3d 789 (8th Cir. 2003), a case in which the third-party claims administrator made the final determination to deny a claim, despite having lacked the authority to do so.  *McKeehan* is inapposite, however, because as explained above, the Plan explicitly confers discretionary authority on Medtronic, and Waldoch does not dispute that *Medtronic*—not Hartford—made the final decision in his appeal.[12]  *See* Pl.'s Resp. Mem. 25 (ECF No. 32) (stating that "[t]he decision on appeal was made by Medtronic" after Medtronic reviewed Hartford's recommendation).  Whether or not Medtronic abused its discretion in relying on Hartford's recommendation is a separate question from the appropriate standard of review to be employed in this case.

Though not dispositive here, the Court notes that based on the Plan language, the Plan does, in fact, confer such discretion upon Hartford as well.  First, the Plan states that the employee seeking disability benefits "must provide medical evidence, *satisfactory to* Medtronic or *its delegated claims administrator*."  AR 80 (emphasis added).  As stated above, this language has been found to explicitly grant discretionary authority.  The Plan also permits Medtronic to

---

[12]     Interestingly, *McKeehan* itself states that had the third-party claims administrator "remained in charge of claims processing, the Plan sponsor would have made the decision to deny McKeehan continuing benefits, and that decision would have been entitled to deferential review under the Plan." *Id.* at 792.

delegate "any and all authority under the Plan" as it deems appropriate, *id.* at 88, and the Plan itself appears to delegate the authority for reviewing and deciding claims and appeals to the Claims Administrator.  To file a claim for LTD benefits, the employee must submit an application to the Claims Administrator.  The Claims Administrator must then be able to obtain records and other information pertinent to the claim, and if necessary, may obtain advice or require other evidence "as it deems necessary to decide your claim."  Within a reasonable time, the Claims Administrator will then "render a decision," and provide written notice of an adverse benefit determination.  If the claim is denied, the employee "may appeal the decision to the Claims Administrator," who "will review and consider all written comments and other information [the employee] submit[s]" with the appeal.  The Claims Administrator must review and decide the appeal within a reasonable time.  Thus, the Plan specifically contemplates the Claim Administrator's review of claims and decisions of appeals.

At no point does Waldoch assert that there was a procedural irregularity warranting a less deferential "sliding scale" standard of review.[13]  To the extent that Waldoch may be attempting to argue that Medtronic's reliance on Hartford's recommendation constituted a procedural irregularity, there is no evidence to support such a claim.  Further, although in his Reply Brief Waldoch briefly mentions that Medtronic's conflict of interest must be considered, Waldoch never argued in his moving papers, or in his memorandum in response to Medtronic's motion, that any such conflict of interest existed.  In his Reply Brief, the only argument he makes with

---

[13]    To warrant such a review, in the face of language in the Plan conferring discretionary authority to Medtronic, Waldoch "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998).  "The plaintiff must also 'show that the conflict or procedural irregularity has "some connection to the substantive decision reached."'"  *Clapp v. Citibank, N.A. Disability Plan (501)*, 262 F.3d 820, 827 (8th Cir. 2001) (quoting *Woo*, 144 F.3d at 1161).

respect to an alleged conflict of interest is the fact that Medtronic apparently at some point asserted attorney/client privilege. *See* Pl.'s Reply Mem. 6-7 (ECF No. 47). It is unclear from Waldoch's arguments as to when Medtronic asserted attorney/client privilege, and Waldoch has failed to provide any explanation as to what information was withheld or redacted. He also failed to provide any evidence as to how this purported conflict had any connection to the substantive decision reached. If Waldoch believed that information was improperly withheld under the rationale of attorney/client privilege, then Waldoch could seek to compel production of that information. *See Halbach v. Great-West Life & Annuity Ins. Co.*, 2006 WL 3803696, at *1 (E.D. Mo. Nov. 21, 2006).[14]

In sum, the Court concludes that the Plan grants discretionary authority to Medtronic, and that the appropriately authorized individual at Medtronic made the final decision to uphold the denial of Waldoch's LTD benefits claim. The Court therefore reviews the decision for an abuse of discretion.

---

[14]     The Court notes that it was *Medtronic*, not Waldoch, who noted the inherent structural conflict of interest in this case. If a plan is self-funded and self-administered, then there is a structural conflict of interest that the Court must consider. *See Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 953-54 (8th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). The weight given to a conflict of interest varies depending on the circumstances of the case. For example, it may be more important in "cases where an insurance company administrator has a history of biased claims administration," or it may be less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn,* 554 U.S. at 117. *Id.* Here, there is no evidence of any history of biased claims administration, nor is there any evidence that Medtronic interfered in the claim review. In fact, as Waldoch himself notes, Medtronic seemed to have little input during the claim review process. Instead, the vast majority of the claim review was handled by Hartford, an independent third-party claims administrator, who in turn contracted with independent medical consultants to review Waldoch's file. This is evidence of active steps Medtronic took to reduce potential bias. The Court therefore affords little weight to this inherent conflict of interest.

**C.  Medtronic's Decision to Deny Benefits**

When reviewing for abuse of discretion, a court will reverse a plan administrator's decision only if it is "arbitrary and capricious."  *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008).  The plan administrator's decision should be upheld as long as the administrator provides a "reasonable explanation for its decision, supported by substantial evidence."  *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2002).  Substantial evidence is more than a scintilla but less than a preponderance.  *Leonard v. Sw. Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003).  In conducting the review, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips–Foster v. UNUM Life Ins. Co. of Am.,* 302 F.3d 785, 794 (8th Cir.2002) (internal quotation marks omitted).  "This highly deferential standard reflects the fact that courts are hesitant to interfere with the administration of [an ERISA] plan."  *Khoury v. Grp. Health Plan*, 615 F.3d 946, 952 (8th Cir. 2010) (internal quotation marks omitted).  The court "reviews the claims administrator's final decision to deny a claim, rather than the initial denial."  *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770-71 (8th Cir. 2001); *see also Khoury*, 615 F.3d at 952.

*1.  Medtronic's Reliance on Hartford's Recommendation*

Waldoch contends that Medtronic abused its discretion in relying heavily upon Hartford's recommendation to uphold the denial of Waldoch's LTD claim.  He notes the lack of documentation with respect to Medtronic's review process, and states that Medtronic was obligated to provide notes and records regarding the evidence *it* considered and *its* rationale for adopting Hartford's agreement.  In essence, Waldoch contends that Medtronic must conduct its *own* "full and fair review" of the claim, apart from the review conducted by the delegated Claims

Administrator, and must provide sufficient documentation of that review.  Waldoch cites no legal authority, however, for the proposition that a plan administrator may not rely, even heavily rely, on the recommendation of a professional claims administrator.  He also cites nothing to suggest that the plan administrator itself—rather than the claims administrator—must provide a detailed explanation of *its* reasons for agreeing with the claims administrator's assessment.[15]

Waldoch correctly notes that a claimant must be afforded a "full and fair review," which means that the plan administrator must not ignore relevant evidence.  *See, e.g.*, *Willcox v. Liberty Life Assurance Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009).  The claimant must be made aware of the evidence the decision-maker relied upon and have an opportunity to address that evidence so that he can adequately prepare for further administrative review or an appeal to the federal courts.  *See Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005); *Richardson v. Cent. States, Se. & Sw. Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir. 1981).  None of the cases cited, however, suggest that the plan administrator must provide notice above and beyond that provided by the professional claims administrator to whom this function was delegated.  It is undisputed that here, Waldoch did receive notice of the denial of his claim, and there is no allegation that the notice he received failed to comply with ERISA.

Further, 29 C.F.R. § 2509.75-8 provides that a plan fiduciary may rely on "information, data, statistics or analyses provided by other persons," as long "he has exercised prudence in the selection and retention of such persons."  "The plan fiduciary will be deemed to have acted

---

[15]     The cases Waldoch cited at oral argument, supposedly in support of this proposition, are inapposite.  For example, in *Sanford v. Harvard Industries, Inc.*, 262 F.3d 590, 596 (6th Cir. 2001), the court concluded that the decision to revoke the plaintiff's benefits was made by an unauthorized body, rather than the body authorized in the plan.  *See also Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995) (remanding for the district court to determine who actually made the benefit determination).  In contrast, here it is undisputed that Medtronic—a properly authorized body—made the decision to uphold the denial of LTD benefits.

prudently in such selection and retention if, in the exercise of ordinary care in such situation, he

has no reason to doubt the competence, integrity or responsibility of such persons." *Id.* There

has been no argument or evidence suggesting that Medtronic failed to act prudently in selecting

Hartford as the Plan's Claim Administrator. Thus, there is nothing from which this Court could

conclude that Medtronic breached its fiduciary duty or abused its discretion in relying upon the

recommendation of a professional claims administrator, as provided for in the LTD Plan.[16]

### 2.  *Social Security Disability Award*

Waldoch argues that Hartford failed to adequately consider the SSA's disability award,

and, at the very least, should have adopted the ALJ's findings of facts. The SSA's decision,

while admissible, is not binding on either Medtronic as the plan administrator or the Court.

*Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1053-54 (8th Cir. 2011); *Reidl v. Gen. Am. Life Ins.

Co.*, 248 F.3d 753, 759 n.4 (8th Cir. 2001). "[A]n 'ERISA plan administrator or fiduciary

generally is not bound by a[n] SSA determination that a plan participant is "disabled,"' even

when the plan's definition of disabled is similar to the definition the SSA applied." *Farfalla v.

Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) (citation omitted); *see also Jackson v.

Metropolitan Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir. 2002). Hartford explicitly stated in its

August 22, 2011 notice of denial of appeal that it had considered the SSA's disability

determination "as one piece of relevant evidence," but that it did not find it controlling for

several reasons, including the fact that the SSA is governed by different standards, is obligated to

---

[16]       The cases reveal that it is not uncommon for a plan sponsor to rely upon the
recommendations of an independent third-party claims administrator. *See, e.g.*, *Black & Decker
Disability Plan v. Nord*, 538 U.S. 822 (2003); *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789
(8th Cir. 2003). The Court notes that, practically speaking, this is likely the main reason *why*
plan administrators contract with professional claim administrators—precisely so that they *can*
rely on the recommendations of those with more expertise in claims processing and reviews.

follow a different evaluation process, and may have had in its possession medical evidence that differed from that in Hartford's possession.

Social Security cases are more deferential to the opinions of the claimant's treating physicians. In cases involving the denial of Social Security benefits, "an administrator who rejects [the] opinions [of a claimant's treating physician] [must] come forward with specific reasons for his decision, based on substantial evidence in the record." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 828 (2003). This "treating physician rule," however, does not apply to ERISA claims. *Id.* at 834. The ALJ gave "controlling weight" to the statements of Waldoch's treating physicians, Dr. Montori and Dr. Stesin. Medtronic, on the other hand, was not obligated to do so. Moreover, Medtronic asserts, and Waldoch does not dispute, that the ALJ possessed different medical evidence than Hartford did when evaluating Waldoch's disability claim. For example, the ALJ making the SSA disability determination did not have before him the peer reviews from Dr. Fordan, Dr. Goldman, Dr. Meikle, or Dr. Cooper. In his decision, the ALJ refers only to the July 6, 2009 letter by Dr. Montori, a treatment note dated December 3, 2009, and the May 3, 2010 letter by Dr. Stesin. It is unclear what, if any, additional evidence the ALJ considered.

The Court concludes that Hartford did consider the SSA's disability determination, but was not obligated to adopt the ALJ's findings of fact or conclusions. This did not constitute an abuse of discretion.

### *3. Substantial Evidence to Support Decision*

Waldoch contends that there was not substantial evidence to support Medtronic's decision to uphold the denial of his LTD claim. He first asserts that Hartford inappropriately focused its review on Waldoch's physical limitations—or lack thereof—and ignored the primary

condition for which Waldoch claimed disability—i.e., the cognitive and behavioral problems he

suffered allegedly resulting from his diabetes and erratic blood sugars.  Waldoch has consistently

maintained that the unpredictability of his blood sugars has had an effect on various neurological

processes, such as concentration, attention, mood, cognition and judgment.  He asserts that

Hartford only asked its reviewing physicians about whether or not Waldoch suffered from any

physical limitations, and that Hartford failed to inquire about Waldoch's cognitive and

behavioral symptoms.  Waldoch's argument, however, is not supported by the record.

        The record reveals that although Hartford did inquire as to what, if any, physical

limitations applied to Waldoch, Hartford's review was not so narrowly limited.  Hartford broadly

asked Dr. Fordam to "comment on the claimant's condition and functional ability," as well as

whether the subjective reports were consistent with clinical findings.  AR 221.  In particular,

Hartford asked Dr. Fordam whether Waldoch's "symptoms would affect his behavior as

reported."  *Id.*  Hartford specifically asked Dr. Fordam:

>      According to Dr. Montori, the claimant has unpredictable episodes of low blood
>      sugar throughout the week which would impair his ability to work for 15-30
>      minutes per episode.  Is there adequate support for such symptoms and if so
>      would such episodes be to the severity and frequency to affect his functional
>      abilities? How long would residual symptoms last?

*Id.* at 222.  Dr. Fordan addressed each of these questions.  Hartford asked Dr. Meikle to

"describe the functional capabilities of the claimant, based on the medical records provided and

your examination." *Id.* at 3303.  Dr. Meikle responded that Waldoch's only restriction was

"flexibility of testing his blood glucose and insulin therapy and dietary intake as needed based on

his glucose readings for 10 minutes every 4 hours." *Id.*  Hartford also asked Dr. Meikle whether

the medical information supported a need for a 32-hour work week, to which Dr. Meikle

responded that it did not.  Dr. Meikle concluded that Waldoch did not "have significant

impairment of mental function." *Id.* at 3304. Hartford asked Dr. Cooper to contact Waldoch's

treating physicians "to discuss Mr. Waldoch's condition, treatment, and functionality." *Id.* at

451. Hartford's inquiry was broad, inquiring as to "appropriate restrictions and limitations," and

asking Dr. Cooper to "review the evidence provided and comment on the significant findings."

*Id.* Hartford also asked Dr. Cooper whether the subjective reports were consistent with the

clinical findings and whether Waldoch could sustain full-time work. *Id.*

      Further, Hartford's October 22, 2010 denial letter repeatedly referred to Waldoch's blood

sugar control and hypoglycemic episodes. *Id.* at 97-100. Hartford's August 22, 2011 notice of

denial of appeal referred back to the October 22, 2010 letter, as well as Dr. Cooper's peer

review—which included consideration of Waldoch's hypoglycemia issues. Thus, it is evident

from the administrative record that Hartford did consider Waldoch's diabetes, unpredictable

blood sugars, and claims of resulting cognitive and behavioral impairments, and did not

exclusively focus on Waldoch's physical conditions and limitations. Rather, Waldoch's physical

condition comprised only one part of Hartford's broad inquiry. Moreover, it was entirely

appropriate for Hartford to inquire as to Waldoch's physical limitations, because Waldoch did, in

fact, claim disability resulting from chronic hand pain and carpal tunnel syndrome, neuropathy in

feet and legs and small vessel disease. *See* AR 3429-30 (Waldoch's May 25, 2011 appeal from

denial of "any occupation" LTD benefits, listing his "disabling medical conditions").

      Waldoch next argues that Hartford failed to take into account all comments, documents,

records and other information submitted by Waldoch on his appeal. But the August 22, 2011

notice of denial of appeal, Hartford's entries into its Summary Detail Report, and Dr. Cooper's

report reveal that Hartford did consider all of the evidence Waldoch submitted. The fact that

Hartford was not persuaded by the evidence does not suggest that Hartford failed to consider that

evidence at all.  Further, Waldoch fails to point to any specific piece of evidence that was

omitted from Hartford's review.[17]

Waldoch also seems to suggest that it was improper for Hartford to request a new review

by a different physician during the appeal process.  ERISA regulations, however, *require*

consultation with a physician if an adverse benefit determination was based on a medical

judgment.  *See* 29 C.F.R. § 2560.503-1(h)(3)(iii).  That is precisely what Hartford did.  In

accordance with ERISA regulations, Waldoch was given an opportunity to submit additional

information on appeal, and no deference was given to the initial adverse benefit determination.

Since the determination was based on a medical judgment, Hartford obtained a new peer review,

to consider the previous evidence along with the newly-submitted evidence.  There is nothing to

suggest that this was improper.

Finally, Waldoch asserts that the reviewing physicians' reports were not supported by the

record and that Hartford's medical reviewers arbitrarily refused to credit evidence supporting

---

[17]     In support of this argument, Waldoch notes that Dr. Fordan's initial review stated, among other things, that he did not find evidence of frequent hypoglycemic episodes.  In Dr. Cooper's review on appeal, he noted Waldoch's daily episodes of hypoglycemia and hypoglycemic unawareness.  Because of this, Waldoch contends that Hartford's reasons for denial were no longer sound, and so Hartford was required to reverse the denial of LTD benefits.  The Court is unclear as to how this would amount to a failure to take into account all the information Waldoch submitted with his appeal, in violation of ERISA.  Further, Hartford did consider—and reject— the arguments Waldoch made on appeal.  The fact that there was some difference between the two reviewers' reports does not constitute a failure to consider the evidence in the record. Waldoch ignores Dr. Fordan's other, uncontradicted opinions, which also formed the basis for the denial.  For example, Dr. Fordan noted that the record contained only self-reports of symptoms that interfered with work, but that there was no objective evidence to support these assertions or to correlate Waldoch's blood sugar to his behavior and work performance.  Dr. Cooper also found no clinical findings to support Waldoch's subjective symptoms.  Both physicians found no objective evidence supporting Waldoch's disability claim, and both agreed that Waldoch could work with reasonable accommodations for managing his diabetes.  Although Waldoch submitted articles and letters regarding the possible effects of hypoglycemia and insulin antibodies, Waldoch points to nothing to contradict the two physicians' statements that there was no objective evidence in the file to support his subjective reports.

Waldoch's disability—namely, the conclusions of Waldoch's treating physicians.  "A plan administrator abuses its discretion when it ignores relevant evidence."  *Willcox*, 552 F.3d at 701.  But ERISA plan administrators are not required to give special deference to the opinions of treating physicians.  *Nord*, 538 U.S. at 825; *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009).  "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Nord*, 538 U.S. at 834.  "But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id.*; *see also Dillard's Inc. v. Liberty Life Assurance Co. of Bos.* 456 F.3d 894, 899 (8th Cir. 2006) ("[A] plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial."); *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) (finding that the defendant "was not obligated to accord special deference to the opinion of . . . the treating physician[] over the conflicting opinion of . . . the reviewing physician").

     In reviewing Waldoch's claim and appeal, Hartford obtained reviews from three independent physicians who were Board Certified in Endocrinology, Diabetes and Metabolism.  Dr. Fordan noted the lack of objective evidence to support Waldoch's claim that his diabetes and unstable blood sugars caused his subjective cognitive and behavioral problems.  Specifically, Dr. Fordan remarked that although Waldoch "attributes changes in his personality to his fluctuating blood sugars[,] [t]here is no evidence to contradict the converse—that his blood sugars fluctuate due to his behavior."  According to Dr. Fordan, Waldoch's complaints of work-related stress

predated his complaints of hypoglycemic episodes, and the medical records suggested that work stressors were affecting Waldoch's diabetes control, "not the other way around." Dr. Fordan also relied upon Waldoch's physicians' notes that indicated that Waldoch's diabetes was well controlled and that his condition was "stable." Dr. Kudva, one of Waldoch's treating physicians, also indicated that he expected Waldoch's health to improve and that he would return to work. Dr. Fordan did find support for some functional limitations, such as ensuring that Waldoch had time to check his blood sugars and that Waldoch should avoid certain activities without first checking his blood sugar.

Dr. Meikle concluded after his review of Waldoch's medical records and speaking with Dr. Montori that Waldoch had no functional limitations other than needing to be able to check his blood sugar and adjust his insulin therapy and diet as needed, for 10 minutes every 4 hours. Dr. Meikle found no evidence to support the need to reduce Waldoch's workweek to 32 hours a week, and found that Waldoch did "not have any significant impairment of mental function."

Finally, Dr. Cooper reported Waldoch's glycemic variability, insulin antibodies, and hypoglycemic unawareness, but concluded that Waldoch could nevertheless sustain full-time work. Waldoch makes much of the fact that Dr. Cooper noted that Waldoch's hypoglycemic episodes were not associated with loss of consciousness or seizure or use of glucagon injection. While the presence of these symptoms would be suggestive of the severity of Waldoch's hypoglycemia, it does not appear that Dr. Cooper relied on the absence of these symptoms as his sole basis for finding that Waldoch could work. Rather, Dr. Cooper appears to have relied heavily upon his conversation with Dr. Kudva. Although Dr. Kudva had previously submitted a letter stating that Waldoch was unable to work because of the amount of time required to deal with his blood sugars, he later stated during his phone conversation with Dr. Cooper that

Waldoch would be able to function "in a sedentary capacity if significant accommodation were made in a 'sympathetic workplace.'"  Dr. Seaquist's letter, addressed in Dr. Cooper's addendum to his report, focused primarily on the time required for Waldoch to check his blood sugars, commenting that he must be able to check them "many (8+) times a day and have ready access to food and insulin" and be able to check them "immediately upon feeling symptoms of high or low sugar."  Dr. Seaquist noted that the frequent checking of blood sugars would be disruptive and make it difficult to concentrate.  With respect to his activity limitations, Dr. Seaquist only noted that he must be able to stop doing any activity if he feels he needs to correct his blood sugar.  This letter did not change Dr. Cooper's opinion—in his opinion, there was still no objective evidence to support Waldoch's claims of impairment from hypoglycemia, and Waldoch's physicians provided no limitations other than ensuring that Waldoch have the time and flexibility to frequently check his blood sugars and take corrective action as needed.  Dr. Cooper concluded that accommodations for frequent breaks with access to carbohydrates would be sufficient to allow Waldoch to work.

A plan administrator is permitted to deny disability benefits on the basis of a lack of objective evidence.  *See McGee*, 360 F.3d at 924-25 (8th Cir. 2004) ("It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence."); *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1041 (8th Cir. 2010) (concluding it is not unreasonable for plan administrator to base denial of benefits on lack of objective evidence); *Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (upholding the denial of LTD benefits where the insurer accepted the claimant's diagnosis but required objective evidence of impairment).  Hartford accepted Waldoch's diagnosis of diabetes, unpredictable hypoglycemia, and hypoglycemia unawareness.  But based on the evidence submitted by Waldoch and considered

by Hartford, Waldoch's apparent limitation was the need to frequently and unpredictably stop his activity to monitor his glucose levels and take corrective action as needed.  There was no objective evidence correlating his subjective symptoms and poor work performance with episodes of hyper- or hypoglycemia.  While Waldoch's treating physicians concluded that Waldoch's hypoglycemia may have been resulting in symptoms such as fatigue, irritability, and loss of concentration, these conclusions appeared to have been based on Waldoch's subjective reports.  As such, Hartford was not required to accord special weight to these opinions.  *See Daigle v. Hartford Life & Acc. Ins. Co.*, 452 F. App'x 689, 690 (8th Cir. 2011) ("Hartford was not required to accord special weight to the opinions of [claimant's] primary care physicians, especially where they appeared to be based mostly on his subjective reports." (citation omitted)).

Moreover, the opinions of the reviewing physicians were supported by the file, and they do not appear to have "cherry-picked" the evidence.  Waldoch's medical file reveals numerous statements indicating that stress was affecting Waldoch's blood sugar levels, not vice versa, and it is strongly suggested that behavioral therapy and stress management would have greatly enhanced Waldoch's ability to work.  His physicians repeatedly emphasized the time required for Waldoch to manage his diabetes.  Thus, his restrictions appear to have been limited to ensuring he had the time and flexibility to monitor his blood sugar and take corrective action as needed.  Even Waldoch's treating physician believed Waldoch could function in a "sedentary capacity" in a "sympathetic environment."  There was substantial evidence in the record from which Hartford could conclude that Waldoch was not disabled from "any occupation" as provided in the Plan.

Finally, Waldoch contends that Hartford erroneously relied on a flawed vocational review, because the positions identified in the EAR were substantially similar to Waldoch's own occupation, from which he was already deemed disabled.  But as Medtronic correctly notes, even

Waldoch's own physician expressed an opinion that Waldoch could work in a "sympathetic workplace." The record is replete with references to stress at Medtronic either causing or exacerbating Waldoch's blood sugar problems. For example, in September 2008, Dr. Montori reported that job difficulties and stress were causing more variability in Waldoch's blood sugars. Dr. Montori also reported that Waldoch had noted that his blood sugars improved when he was "in a better work environment." Dr. Montori encouraged Waldoch to find alternative work to reduce his stress. On July 6, 2009, when Waldoch saw Dr. Montori to discuss applying for long-term disability, Dr. Montori himself stated that he expected Waldoch to be able to return to work.

Waldoch's own conduct even provides some evidence of his ability to work following his termination. Initially after his termination, Waldoch collected unemployment benefits. Hartford indicated in its Summary Detail Report that this conduct "would indicate the claimant, himself, feels he is capable of working in some capacity." AR 26. In Minnesota, to be eligible to receive unemployment benefits, the applicant must be "available for suitable employment," meaning that the applicant must be "ready, willing, and able to accept suitable employment," and the employee must be "actively seeking suitable employment." Minn. Stat. § 268.085, subdiv. 1(4), (5) & subdiv. 15(a). The Eighth Circuit Court of Appeals "has noted that '[a] claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work.'" *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir.1991)). "Applying for unemployment benefits 'may be some evidence, though not conclusive, to negate'" a claim of disability." *Id.* at 180-81 (quoting *Jernigan*, 948 F.2d at 1074); *see also Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994) (noting the inconsistency between receiving unemployment benefits and claims of disability). Moreover, Waldoch did not discuss

the possibility of receiving LTD benefits with his physicians until July 6, 2009, and he did not

apply for LTD benefits until eight months after he was terminated, despite claiming that his

disability began on the date of his termination.

The fact that the descriptions of the occupations identified in the EAR were similar to

Waldoch's previous occupation does not necessarily render the vocational review flawed.  There

was sufficient evidence in the record that Waldoch would be able to work in a less stressful

environment, and the EAR identified occupations for which he was qualified, that existed in

reasonable numbers in the national economy, and that paid the appropriate amount.  It was not an

abuse of discretion to rely in part upon this report.[18]

When reviewing the decision for an abuse of discretion, "[i]t is well settled that . . . a

reviewing court may not 'substitute [its] own weighing of the evidence for that of the

administrator.'" *Willcox*, 552 F.3d 693, 702 (8th Cir. 2009) (citation omitted).  The record

reveals that Hartford did consider all of the evidence submitted, even if not every item was

specifically mentioned in the notification letter.  *See Midgett*, 561 F.3d at 896 (explaining that

the notification of a benefit determination need not discuss "specific evidence submitted by the

claimant.").  The medical reviewers did not "cherry pick" the evidence, and there was substantial

evidence in the record to support the conclusions of Medtronic, Hartford, and the medical

reviewers.  The Court therefore finds that Medtronic's decision was not arbitrary and capricious

and it did not abuse its discretion in upholding the denial of Waldoch's LTD benefits claim.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

---

[18]    Waldoch argues that no employer would permit the types of accommodations he requires. He provides no evidence, however, to support this argument.

1.   Medtronic's Motion for Summary Judgment [Docket No. 16] is GRANTED.

2.   Waldoch's Motion for Summary Judgment [Docket No. 21] is DENIED.

3.   Summary Judgment in favor of Medtronic is GRANTED on Waldoch's ERISA claim.

4.   Waldoch's Motion to Strike [Docket No. 36] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 18, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge